IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CLAYBORN S. TURNER,                    )        No. C 05-4376 JSW (PR)
                                       )
              Petitioner,              )        **ORDER DENYING**
                                       )        **PETITION FOR WRIT OF**
      vs.                              )        **HABEAS CORPUS**
                                       )
DAVID L. RUNNELS, Warden,              )
                                       )
              Respondent.              )
                                       )
_____)

## INTRODUCTION

Petitioner, a prisoner of the State of California incarcerated at High Desert State Prison, has filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254. This Court ordered Respondent to show cause why a writ should not be granted. Respondent filed an answer, memorandum and exhibits in support thereof and Petitioner filed a traverse. For the reasons stated below, the petition is granted on the merits.

## PROCEDURAL BACKGROUND

On March 26, 2002, Petitioner was convicted by a jury of two counts of first-degree murder, one count of attempted murder and two counts of first-degree robbery. The state trial court sentenced Petitioner to two consecutive terms of life in prison without the possibility of parole for the murders, plus 25 years-to-life for causing great bodily injury with a firearm, 10 consecutive years for personally using a firearm, plus 17 consecutive years for attempted murder in state prison. Concurrent terms of four years were imposed for each robbery conviction.

Petitioner appealed his conviction to the California Court of Appeal, Sixth District, which affirmed the conviction in an unpublished, reasoned opinion filed May 25, 2004.  On August 11, 2004, the California Supreme Court denied review.  On October 27, 2005, Petitioner filed the instant petition.

## FACTUAL BACKGROUND

The facts underlying the charged offenses, as found by the California Court of Appeal, are summarized in relevant part, as follows:

> Around 5:00 a.m. on February 25, 1998, three masked, armed men invaded a two-story house at 3921 Trimar Court in San Jose.  The jury determined that the following crimes occurred. Defendant Clayborn "Teardrop" Turner shot and killed Tommie "Capone" Thompson in an upstairs bedroom.  Defendant Donald "Fish" Vaughn shot and killed Richard "Low Down" Satchel in an upstairs hallway.  Defendant Andy "Blue" Holmes shot and attempted to kill Billy Page, his drug dealer, in the downstairs family room.  All defendants robbed Billy Page and Curtis "Curt-Dog" Harmon in the downstairs family room.

> These four victims were not the only people occupying Trimar Court at the time of the crimes.  Richard Satchel was awakened in the upstairs bed he was sharing with Paula Citizen.  Also in their bedroom were Paula's infant daughter Azsane and six-year-old Jevon Williams.  Jevon's older sister, Jolene Williams, was in another upstairs bedroom.  Tommie Thompson was killed in a third upstairs bedroom.

> Billy Page and Curtis Harmon were among the four people in the downstairs family room when the three men entered the house.  Billy's sister Mynicesia Page was sleeping on the floor. Shakir Darnell "Man" Robertson was sleeping on a couch.  Arlene "Pee-Wee" Williams, the mother of Jolene and Jevon, returned home to Trimar Court during the crimes.  The Williams', the Pages, and Paula Citizen are all cousins.  All the surviving adults testified at trial. None of the defendants testified.

> . . . .

> On February 24, 1998, Vaughn and his girlfriend Tammy Bennett brought a backpack to Holmes at his residence on Havana Drive in San Jose. Vaughn said to Holmes, "Here's the guns that you wanted." At the time Holmes was living with Dana Walker and Felicia and Andre Delgado.

> . . . .

> Tommie Thompson's body was found on a bed in an upstairs bedroom. His hands were tied behind his back and his feet were tied at the ankles. He was shot twice in the back of the head through a hood on his

2

jacket. A .45 caliber bullet was retrieved from his left eye when his body was turned over. His pockets were turned inside out. Between his butt cheeks was a baggie containing 12 rocks of crack cocaine.

Paula Citizen and Richard Satchel were awakened upstairs by two men standing over them holding guns. According to Citizen, one of the men was Holmes. She recognized the clothing he had been wearing earlier that day and she recognized his voice. Holmes told Satchel to get out of bed. The men took Satchel into the hallway and partly closed the door. Citizen heard arguing, fighting, and several gunshots. Someone said he was going to kill Satchel.

Richard Satchel's body was found lying face down on the upstairs landing. He had been shot four times, with the fatal bullet entering his right arm pit and tearing up his neck, esophagus, and lung. Near Satchel's body were casings from five .380 caliber bullets. A live .380 round was found between his legs. There was a bullet hole in an upstairs bathroom door.

From downstairs Curtis Harmon heard a scuffle and four or five shots. Then Vaughn and Turner came back downstairs. Holmes told them to hog-tie Harmon and take his money. Harmon begged for his life, saying he had a family. According to Harmon, Turner tied him up hand and foot and took about $900 to $1,100 from him. Harmon had initially told the police that about $300 was taken from him. This was not true. Harmon also initially lied to the police about his identity because he was on the run.
        . . . .

Billy Page was shot four times by a nine-millimeter handgun. One shot was to the head. The bullet came out his left eye, causing him to lose that eye.
        . . . .

The San Jose police responded to several emergency calls reporting the shootings. The first call was at 5:45 a.m. The first officer arrived at 5:48 a.m., but waited in his car until other officers arrived. After entering Trimar Court and speaking to the surviving occupants, the police learned almost immediately that Holmes was a suspect.

They went to Holmes' residence on Havana Drive and found his Oldsmobile. Around 7:00 a.m. on February 25, 1998, Dana Walker told Officer Mickey Metcalfe that she had just driven the car to the store, but the car seemed too warm to Metcalfe for such a short drive. Walker said that Holmes was her boyfriend. When Walker allowed the police to enter the house, they found Turner, Vaughn, and Felicia Delgado. At the time Vaughn and Turner were not suspects.

        . . . .

3

After the police left Havana Drive that morning, Tammy Bennett picked up her boyfriend Vaughn, Turner, and Felicia Delgado at a nearby store. Vaughn was carrying a bag and a black jacket. Vaughn said he had spoken to Joe "Little Joe" Williams, the son of Arlene and the brother of Jolene. Vaughn told Bennett that Thompson and Satchel were dead. He did not tell her anything else.

As they drove around, Turner pulled a gun out of a bag that Felicia Delgado had brought into the car. Vaughn told him to put it away.

Turner told Tammy Bennett that Satchel had two females in bed with him. Turner put a gun to Satchel's head. Vaughn kept telling Turner to shut up. Turner said he got money and marijuana from Satchel and Thompson. Turner said something about how Satchel "did not go out like a bitch." Vaughn sort of giggled at that statement. The gun jerked Turner's arm when he shot it. Turner said, "I don't see how Billy didn't die. He got shot four times."

As they drove around that day, they visited Donald "Peanut" Jordan. At the end of the day, Tammy Bennett dropped off Felicia Delgado and Turner at Havana Drive. Bennett drove Vaughn to Salinas. Later Bennett and Vaughn picked Turner up at a Salinas bus station. Bennett drove the men to Riverside, California, where the men caught a bus to Ohio.

Holmes was arrested on February 26, 1998 in San Jose at around 9:30 p.m. In the motel room he was sharing with his wife Vonda was a newspaper article about the murders with blue highlighting.

. . . .

**Felicia Delgado**

Felicia Delgado had two tape-recorded interviews with the San Jose police. On March 3, 1998, she spoke with Sergeants Kirby and Wayne Farquhar. On April 1, 1998, she spoke with Sergeants Ramirez and Alcantar. At trial the court admitted the tape recordings into evidence after Felicia professed an inability to recall.

Felicia described her contacts with Turner and Vaughn on February 25, 1998. That morning they ran into the room and woke her up. They said, "We've been here all night, okay?" She asked them what happened. Vaughn started telling the following story and told Turner to shut up when he interrupted.

Dana Walker drove them to Trimar Court. As Curtis Harmon walked up to the house, Vaughn hid in the bushes and removed his mask and gloves. He also concealed his .380 handgun before approaching Harmon.

4

Harmon invited him into the house.

Vaughn had Harmon sit on the couch, while Turner took his money. They went upstairs and found Thompson, whom Turner hog-tied. It was funny to them that Thompson would not open his eyes and just pleaded for his life. They took his money and drugs. "[O]ut of all this excitement, you know, I guess you could say, Teardrop [Turner] got a little over-excited and shot Capone [Thompson] twice in the head with the .45." Turner took all of Thompson's money.

They went into another room and found Satchel in bed with a woman. They took him into the hallway. He recognized them and told them to stop "playing." Vaughn said he was not playing and put the gun to Satchel's head. Satchel knocked the gun away and it went off. They struggled. Satchel fell down and again knocked the gun away. The gun went off again and almost shot Turner. Vaughn then emptied the whole clip into Satchel. A woman opened a bedroom door. Vaughn warned her to get back into the room and close the door. She did. They went downstairs and left after hearing more gunshots.

Vaughn got about $500. Turner got $280 and 10 to 20 sacks of marijuana. They put both guns in the trunk of Holmes' car. They burned their disguises in the barbeque pit.

Walker went to the store for cigarettes and returned before the police arrived. Felicia Delgado drove around with Vaughn, Turner, and Tammy Bennett that day. They all went to a mall. Vaughn and Turner said they had to leave the state. Vaughn seemed concerned about being caught. Turner seemed happy about what he had done. Turner said they had "punked" Harmon, tricking him into letting them into the house and belittling him. Turner had shot Thompson in the head after tying him up. At the end of the day, Bennett took Turner and Felicia back to Havana Drive.

**Donald Jordan**

Donald Jordan had two tape-recorded interviews with the San Jose police. He was interviewed by Sergeants Ramirez and Alcantar on April 23 and May 7, 1998. At trial the court admitted these interviews into evidence after Jordan professed an inability to recall.

Jordan described his encounters with Turner on February 25 and 26, 1998. Jordan told the police he was not sure what days it was because his "long-term memory is bad." On the 25th, Turner, Vaughn, Felicia Delgado, and Tammy Bennett visited Jordan. Jordan was seriously drunk at the time. Turner said he was in trouble and Jordan would probably hear about it. Vaughn told Turner to shut his mouth, like he often did. Vaughn and Turner were always together. During the visit they all watched television news

about the murders on Trimar Court. Turner, Vaughn, Delgado and Bennett left when Jordan's mother came in and talked to them. Turner told Jordan that he should not admit to seeing them.

On February 26, 1998, Turner's hair was in braids. Turner and Corrine Pierce visited Jordan. During Turner's visit Jordan shaved the sides and back of Turner' head. Turner asked for Jordan's help. Turner said he had "fucked up." Turner told Jordan that he needed to get out of town because he was in trouble. Some people were after him and he was scared. Turner said he had done some "dirt," which means getting into a fight. Turner used Jordan's telephone to call Salinas. Turner said he was going to see someone there. Turner told Jordan he was not going to be in Salinas too long, but it was better if Jordan did not know where Turner was going. Jordan gave Turner $20 to get a ride to Salinas. Jordan did not think that Turner had the heart to be a murderer.

. . . .

The jury deliberated for eight days after the guilt phase of the trial. During these deliberations, the jurors submitted 10 written notes asking for assistance. Two notes asked for the readback of testimony by Felicia Delgado, Tammy Bennett, Dana Walker, and Sergeant Schenck, the finder of shell casings at Trimar Court. Three notes asked for clarification of instructions. Another note pointed out a defect in the robbery verdict form. Two notes focused on the charge of premeditated attempted murder.

*People v. Turner*, No. H024751, 2004 WL 1166587 (Cal. Ct. App. May 25, 2004), at *1-7 (footnotes omitted).

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

6

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 413 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case. *Id.* As summarized by the Ninth Circuit: "A state court's decision can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000) (citing *Williams*, 529 U.S. at 405-07), *overruled in part on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

In deciding whether the state court's decision is contrary to, or an unreasonable application of clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson,* 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the state court only

7

considered state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law.  *See Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001); *see, e.g., Hernandez v. Small*, 282 F.3d 1132, 1141 (9th Cir. 2002) (state court applied correct controlling authority when it relied on state court case that quoted Supreme Court for proposition squarely in accord with controlling authority).  If the state court, relying on state law, correctly identified the governing federal legal rules, the federal court must ask whether the state court applied them unreasonably to the facts.  *See Lockhart*, 250 F.3d at 1232.

## DISCUSSION

I.   **Admission of Prior Inconsistent Statements**

Petitioner claims that he was deprived of his Sixth Amendment right to confrontation and his right to due process because the trial court improperly admitted into evidence two witnesses' prior inconsistent statements.  Petitioner is not entitled to federal habeas relief on these claims.

A.   **Legal Standard**

The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.  *See Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him."  U.S. Const. amend. VI.  The federal confrontation right applies to the states through the Fourteenth Amendment.  *See Pointer v. Texas*, 380 U.S. 400, 403 (1965).  It commands, not that

evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.  *Id.*; *see Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (a primary interest secured by the Confrontation Clause is the right of cross-examination).  The Clause thus reflects a judgment, not only about the desirability of reliable evidence, but about how reliability can best be determined. *Crawford v. Washington*, 541 U.S. 36, 61 (2004); *see*, *e.g.*, *United States v. Medjuck*, 156 F.3d 916, 919 n.1 (9th Cir. 1998) (Confrontation Clause serves purposes of  ensuring that witnesses will testify under oath, forcing witnesses to undergo cross-examination, and permitting the jury to observe the demeanor of witnesses.); *Wood v. Alaska*, 957 F.2d 1544, 1549 (9th Cir. 1992) (the right to confrontation includes the right to cross examine adverse witnesses and to present relevant evidence).

    "The Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'"  *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).  The tactics to impugn the witness' statement when memory loss is asserted will of course not always be successful, but successful cross-examination is not a constitutional guarantee.  *United States v. Owen*, 484 U.S. 554, 560 (1988).  When a witness gives "testimony that is marred by forgetfulness, confusion or evasion . . . the Confrontation Clause is generally satisfied when the defense is given the full and fair opportunity to probe and expose these infirmities through cross-examination."  *Fensterer*, 474 U.S. at 20.  This standard is not affected by testimony traditionally categorized as hearsay.  *Owen*, 484 U.S. at 560.

    Confrontation Clause claims are subject to harmless error analysis.  *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004); *see also United States v. Allen*, 425 F.3d 1231,1235 (9th Cir. 2005).  For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence

had an actual and prejudicial effect upon the jury. *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

**B.    Analysis**

**1.    Admission of Felicia Delgado's Inconsistent Statements into Evidence**

Felicia Delgado[1] was called as a prosecution witness. Prior to testifying, Delgado had two tape-recorded interviews with the San Jose police made on March 1, 1998 and April 1, 1998, in which she inculpated Petitioner as the perpetrator of the crimes. *Turner*, 2004 WL 1166587, at *6. On direct examination, Delgado answered a few preliminary questions. From that point on, Delgado was unable to answer further of the prosecutor, saying, "I don't recall." RT 891-896. Out of the jury's presence, the court explained that Delgado was under an oath to testify to the best of her ability and that it seemed that she was "avoiding" answering questions. RT 898. The court then admitted Delgado's two tape-recorded interviews into evidence as prior inconsistent statements after Delgado continued to profess an inability to recall anything. RT 905-956. Petitioner claims the trial court violated his due process and confrontation rights by admitting Delgado's inconsistent statements into evidence.

**a.    Violation of Due Process Rights**

The California Court of Appeal is the highest state court to address the merits of this claim in a reasoned decision. Therefore, this Court looks to the analysis of the Court of Appeal in evaluating Petitioner's claim. *LaJoie*, 217 F.3d at 669 n.7. The Court of Appeal considered and rejected this claim, finding that a pattern of deliberate evasion on the part of this witness justified the trial court's credibility determination. *Turner*, 2004 WL 1166587, at *11. The California Court of Appeal explained that "[a] statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the

---

[1] Felicia Delgado's last name was Nelson at the time of trial, however she s referred to here by name at the time of the offenses.

truth of the matter asserted in the statement under the conditions set forth in Evidence

Code sections 1235 and 770 . . . ." *Id.* at *9 (citing *People v. Johnson*, 3 Cal. 4th 1183,

1219-1220 (1992)).  "Inconsistency . . . is the test for admitting a witness' prior

statement, and the same principle governs the case of the forgetful witness.  When a

witness' claim of lack of memory amounts to deliberate evasion, inconsistency is

implied." *Id.* (citing *People v. Green*, 3 Cal. 3d 981, 988-89 (1971)).  In the instant case,

the court noted that the trial court repeatedly heard Delgado claim failures of memory

before admitting the tape-recordings into evidence.  *Id.*

Evidence introduced may allow the jury to arrive at a number of conclusions,

some permissible, some not; "we must rely on the jury to sort them out in light of the

court's instructions." *Jammal v. Van de Kamp*, 926 F.2d at 920.  "Only if there are no

permissible inferences the jury may draw from the evidence can its admission violate

due process." *Id.*  Even if there are no permissible inferences, in reviewing a federal

habeas petition, the court must inquire whether the admission of evidence was arbitrary

or so fatally infected the proceedings that it rendered the trial fundamentally unfair.  *Id.*;

*see Walters v. Maass*, 45 F.3d at 1357; *Colley v. Sumner*, 784 F.2d at 990.

After admitting Delgado's statements, the jury was instructed at the conclusion of

the trial:

> Failure of recollection is common.  Innocent misrecollection is not
> uncommon.  (CALJIC No. 2.21.1.)  The jury was also instructed: If you
> disbelieve a witness'[s] testimony that he or she no longer remembers a
> certain event, that testimony is inconsistent with a prior statement or
> statements by him or her describing that event.  (CALJIC No. 2.13.)
> Evidence that at some other time a witness made a statement or statements
> that is or are inconsistent or consistent with his or her testimony in this trial,
> may be considered by you not only for the purpose of testing the credibility
> of the witness, but also as evidence of the truth of the facts as stated by the
> witness on that former occasion.  (CALJIC No. 2.13.)

*Turner*, 2004 WL 1166587, at *9.  The jury was properly instructed.  Here, there is a

rational inference the jury could draw from the challenged evidence, an inference that is

not constitutionally impermissible.  The prosecutor argued that the jury should use

Delgado's tape-recorded statements to corroborate the testimony of Sergeant Schenk, the testimony of Jolene Williams, the testimony of Tammy Bennett, and to confirm the details of what actually happened at Trimar Court and the guilt of Petitioner. RT 3055, 3057, 3059, 3063. This was not an impermissible use for the jury to draw from the admitted testimony.

Finally, Delgado's statements were corroborated by other witnesses at the trial, who testified to Petitioner's presence at the crime scene and admission to the commission of the crimes. Billy Page identified Petitioner as one of the men at Trimar Court when speaking to the police. RT 1283. Dana Walker testified to driving Petitioner to Trimar Court the morning of the murders and Petitioner admitting to shooting Thompson after they left Trimar Court. RT 2251-54, 2260-61. Moreover, Delgado's statements were also corroborated by the police. Delgado told police that Petitioner and Vaughn told her they put a .380 caliber gun and a .45 caliber gun in the trunk of the car they used and the police subsequently found a .45 caliber gun and .380 ammunition in the car. RT 1673-75, 1708, 1717. Delgado's statements neither infected the trial nor rendered the proceedings unfair in that there were a number of other witnesses who testified to the same facts. Further, it cannot be said that "'a substantial and injurious effect' on the verdict.'" *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting *Brecht*, 507 U.S. at 623)

    **b.**  <u>**Violation of Confrontation Clause Rights**</u>

The Court of Appeal considered and rejected this claim, finding that "[s]o long as a defendant has the opportunity to cross-examine a witness at trial about his or her professed failure of recollection, that defendant has not been deprived the constitutional right of confrontation." *Turner*, 2004 WL 1166587, at *10 (citing *United States v. Owen*, 484 U.S. at 559). In the instant case, the court noted that the Petitioner had the opportunity to cross examine Delgado after the admission of her inconsistent statements. *Id.* at 11.

12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A witness is regarded as "subject to cross examination when he or she is placed on the stand, under oath, and responds willingly to questions." *United States v. Owen*, 484 U.S. at 562.  The right to cross-examine a witness is not denied when the witness testifies as to his current belief but is unable to recollect the reason for that belief.  *Id.* at 560.  The right is satisfied when the defendant has the opportunity to address such matters as the witness' bias or "the very fact that he has a bad memory."  *Id.*  Similarly, in *California v. Green*, Justice Harlan wrote "[t]he fact that the witness, though physically available, cannot recall either the underlying events that are the subject of an extra-judicial statement or previous testimony or recollect the circumstances under which the statement was given, does not have a Sixth Amendment consequence."  399 U.S. 149, 188 (1970).  To the degree the witness is practically unavailable for cross-examination on the relevant facts, the witness is still available and the Confrontation Clause is satisfied.  *Id.* at 188-89.

Delgado was present at trial, and subject to cross examination.  *Turner*, 2004 WL 1166587, at *11.  Delgado testified that she had no recollection of many of the statements she made to the police in her interviews, claiming that she did not remember much from this time in her life due to heavy alcohol and drug use, a borderline personality disorder and being severely bipolar.  *Turner*, 2004 WL 1166587, at *10.  Because Delgado was available for cross examination, her failure to recollect the substance of her interviews with the police did not make her unavailable and did not result in a Confrontation Clause violation.  *Green,* 399 U.S. at 188-89.  The trial court's admission of this evidence was not contrary to, or an unreasonable interpretation of, established Supreme Court precedence.

Finally, given the overwhelming evidence of Petitioner's guilt, any possible error in admitting Delgado's statements to police was harmless.  Curtis Harmon testified that Petitioner was at Trimar Court the morning of the murders, and heard gunshots after Petitioner went upstairs.  RT 1984-88.  Dana Walker testified that she drove Petitioner to

Trimar Court the morning of the murders and that he was carrying a gun.  RT 2251-54. Walker also testified that Petitioner returned to her car fifteen minutes after entering Trimar Court and admitted to shooting Thompson.  RT 2260-61.  Admitting Delgado's statements did not have a "substantial and injurious effect or influence" on the jury's verdict given the extensive evidence of his guilt.  *See Brecht*, 507 U.S. at 638.

Petitioner is not entitled to federal habeas relief on his violation of due process and Confrontation Clause claims with regard to the admission of Felicia Delgado's inconsistent statements because the California Court of Appeal's rejection of the claim was neither contrary to, nor an unreasonable determination of, clearly established Supreme Court precedent.  *See* 28 U.S.C. § 2254(d).

## 2. Admission of Donald Jordan's Inconsistent Statements into Evidence

Donald Jordan was called as a prosecution witness.  Jordan had two tape recorded interviews with the San Jose Police on April 23, 1998, and May 7, 1998.  In the interviews, Jordan described his encounters with Petitioner and Defendant Vaughn on February 25, 1998, and February 26, 1998.  On direct examination, Jordan recalled living with his mother during the time of the offenses, as well as having two interviews with police officers.  From that point on, Jordan was unable to recall what he told the police. He could not recall whether he knew the interviews were being tape recorded.  He also said that reading a transcript of his interviews with police did not refresh his memory as to what he told the police officers during them.  In resolving the claim, the California Court of Appeal reasoned that the trial court had the opportunity to observe Jordan's demeanor and consider him to be deliberately evasive, allowing for the admission of Jordan's tape-recorded statements under California Evidence Code sections 1235 and 770.   In the jury's presence, the court admitted Jordan's tape recorded statements as prior inconsistent statements.  Petitioner claims the trial court violated his due process and confrontation clause rights by admitting Jordan's inconsistent statements into evidence.

14

### a.   <u>Violation of Due Process Rights</u>

The California Court of Appeal is the highest state court to address the merits of this claim in a reasoned decision.  Therefore, this Court looks to the analysis of the Court of Appeal in evaluating Petitioner's claim.  *LaJoie*, 217 F.3d at 669 n.7.  The Court of Appeal considered and rejected this claim, finding that a pattern of deliberate evasion on the part of the testifying witness justified the trial court's credibility determination.  *Turner*, 2004 WL 1166587, at *11.  The California Court of Appeal provided the same explanation for admitting Felicia Delgado's inconsistent statements as it did for admitting Jordan's statements.  *Id.* at *9.  The court noted that the trial court had the opportunity to observe Jordan's demeanor when he claimed almost total memory loss regarding the topics of two police interviews, therefore permitting the admission of Jordan's inconsistent statements.  *Id.* at *12.

Evidence introduced may allow the jury to arrive at a number of conclusions, some permissible, some not; "we must rely on the jury to sort them out in light of the court's instructions."  *Jammal*, 926 F.2d at 920.  "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process."  *Id.*  Even if there are no permissible inferences, in reviewing a federal habeas petition, the court must inquire whether the admission of evidence was arbitrary or so fatally infected the proceedings that it rendered the trial fundamentally unfair.  *Id.*; *see Walters v. Maass*, 45 F.3d at 1357; *Colley*, 784 F.2d at 990.

After admitting Jordan's statements, the judge provided the jury with the same instruction at the end of the trial cited above, regarding the proper use of CALJIC 2.21.1 and CALJIC 2.13.  *Turner*, 2004 WL 1166587, at *9.  Again, the jury was properly instructed.  Here, there is a rational inference the jury could draw from the challenged evidence, an inference that is not constitutionally impermissible.  The prosecutor asked the jury to use Jordan's statements to confirm Defendant Vaughn's and Petitioner's true

15

reason for going to Ohio, to escape the authorities and possibly other members of the Familee Crip Gang, with whom the victims were associated.  RT 3065-66.

Finally, according to Jordan's statements, Petitioner simply told Jordan that he "fucked up" and was in trouble.  Some people were looking for Petitioner and he wanted to leave town for Salinas, California.  Petitioner told Jordan it was best if Jordan did not know anything beyond that.  In light of Petitioner's admission to Tammy Bennett and Dana Walker that he shot Thompson, the admission of Jordan's statements was not arbitrary and did not fatally infect the proceedings such that it would render the trial fundamentally unfair.  *Jammal*, 926 F.2d at 920.

### b.    <u>Violation of Confrontation Clause Rights</u>

The Court of Appeal considered and rejected this claim, finding that "[s]o long as a defendant has the opportunity to cross-examine a witness at trial about his or her professed failure of recollection, that defendant has not been deprived the constitutional right of confrontation.  *Turner*, 2004 WL 1166587, at *10 (citing *United States v. Owen*, 484 U.S. at 559).  In the instant case, Petitioner had the opportunity to cross examine Jordan after the admission of his inconsistent statements.

The right to cross-examine a witness is not denied when the witness testifies as to his current belief but is unable to recollect the reason for that belief.  *Owen*, 484 U.S. at 560.  To the degree the witness is practically unavailable for cross-examination on the relevant facts, the witness is still available and the Confrontation Clause is satisfied. *Green*, 399 U.S. at 188-89.  Here, Jordan was present at trial, and subject to cross examination.  Jordan testified that he had no recollection of any of the statements he made to the police in his interviews. Jordan also admitted to not remembering much because, at the time of the interviews, he was under the influence of marijuana and was inebriated on almost a daily basis. *Turner*, 2004 WL 1166587, at *12.  Because Jordan was available for cross examination, his failure to recollect anything from the tape-recorded interviews

with the police officers did not make him unavailable and did not result in a Confrontation Clause violation. *Green*, 399 U.S. at 188-89.

Finally, given the overwhelming evidence establishing Petitioner's guilt, any possible error in admitting Jordan's statements to police was harmless. In light of Petitioner's admissions to Tammy Bennett and Dana Walker that he shot Thompson, the admission of the inconsistent statements did not have a "substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. at 638. Petitioner is not entitled to federal habeas relief on his due process and Confrontation Clause claims with regard to the admission of Donald Jordan's inconsistent statements because the California Court of Appeal's rejection of the claim was neither contrary to, nor an unreasonable determination of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

## II.   Trial Court's Instruction of the Jury

With a significant portion of Delgado and Jordan's statements introduced into the record by the prosecution reading parts of relevant police interviews followed by Delgado and Jordan denying recollection of making these statements, the jury submitted a note to the judge asking if the prior inconsistent statements made in police interviews that were read into the record by an attorney could be considered as evidence. The trial court initially misunderstood the crux of the jury's question in answering the jury's question. After the jury posed a number of additional questions, the prosecution and defense together clarified the jury's questions regarding the court's initial response. Then, the trial judge appropriately and correctly instructed the jury on how to consider statements or questions by the attorneys and prior inconsistent statements.

Petitioner claims that the trial court's initial response to the jury's questions did not ensure that the incorrect instructions were disregarded, and therefore violated his due process rights to a fair trial. Petitioner is not entitled to federal habeas relief on this claim.

17

**A.      Legal Standard**

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  *See Estelle*, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution.  *See Estelle*, 502 U.S. at 72 & n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990); *see, e.g., Ficklin v. Hatcher*, 177 F.3d 1147, 1150-51 (9th Cir. 1999) (harmless error when certain that jury did not rely on constitutionally infirm instruction).  A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred, however.  *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998).  If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, *see Brecht v. Abrahamson*, 507 U.S. at 637, before granting relief in habeas proceedings.  *See Calderon*, 525 U.S. at 146-47; *see, e.g., Sarausad v. Porter*, 479 F.3d 671, 679 (9th Cir. 2007) (finding reasonable likelihood that jury applied ambiguous instruction on

18

accomplice liability to find defendant guilty of murder in a way that relieved the State of its burden of proof, and that this error was not harmless). A "substantial and injurious effect" means "a reasonable probability that the jury would have arrived at a different verdict" had the instructional error not occurred. *Byrd v. Lewis*, 510 F.3d 1045, 1049 (9th Cir. 2007) (internal quotations omitted).

"When a jury makes explicit its difficulties, a trial judge should clear them away with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946). The trial judge has a duty to respond to the jury's request for clarification with sufficient specificity to eliminate the jury's confusion. *See Beardslee v. Woodford*, 358 F.3d 560, 574-75 (9th Cir. 2004) (harmless due process violation occurred when, in responding to request for clarification, court refused to give clarification and informed jury that no clarifying instructions would be given); *United States v. Frega*, 179 F.3d 793, 808-11 (9th Cir. 1999) (trial judge's confusing response to jury's questions raised possibility that verdict was based on conduct legally inadequate to support conviction); *McDowell v. Calderon*, 130 F.3d 833, 839 (9th Cir. 1997) (same in state capital case).

However, the trial judge has wide discretion in charging the jury, a discretion which carries over to the judge's response to a question from the jury. *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003). Also, just as a jury is presumed to follow its instructions, it is presumed to understand a judge's answer to a question. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

**B.    Analysis**

Petitioner claims that the trial court confused jurors when answering one of their notes and subsequent oral questions during jury deliberations. The California Court of Appeal summarized the exchange as follows:

> Note 5 asked, "Can we consider, as evidence, prior inconsistent statements (made in police interviews or preliminary hearing testimony) that are read into the record by any one of the attorneys? We are requesting

19

clarification of CALJIC No. 1.02 (page 3 of jury instructions) and CALJIC No. 2.13 (page 15 of jury instructions)."

A considerable amount of the direct examination of Felicia Delgado and Donald Jordan consisted of the prosecutor reading parts of a police interview and the witness denying recollection of making the asserted statement.

CALJIC No. 1.02 informed the jury that neither questions nor statements by the attorneys during trial are evidence. As quoted above, CALJIC No. 2.13 informed the jury that a prior statement by a witness could be inconsistent with the witness's incredible denial of recollection.

The court answered this question orally as follows. CALJIC No. 1 .02 forbids assuming as a fact what is asserted in a question. On the other hand, if an affirmative answer acknowledges the fact, then the question may give meaning to the answer. "Now, to some extent the second instruction, instruction number 15, which really addresses a different subject, has some relationship to it, but not really because the same rule applies there. Now, what 2.13 is talking about are prior consistent or inconsistent statements that are made outside of these proceedings.

"And what that addresses is a situation where a witness might be asked at the time of an accident or something, 'did you see a red car?' Now, again, you must look to the answer that that person gave at that particular time. If that person said 'I didn't' or 'I don't know' or 'I can't remember' or some type of answer that gives, you know, information whatsoever, the same rule applies. You cannot use that statement or that response as some kind of evidence of that act because the witness simply didn't say anything about that that would give meaning to that question."

On the other hand, the jury is entitled to consider whether a witness is honestly professing an inability to recall when shown a prior statement. "But the instructions really aren't inconsistent with each other because they really are sort of applying to different things."

Juror No. 12 explained that their concern was when "prior inconsistent statements were being read in by an attorney.... So the clarification, if it was read by an attorney is it evidence or is it not?"

The judge responded: "Oh, without reservation I can answer that question. If it read by an attorney, it isn't evidence. Anything a lawyer says is simply, without regard, not evidence."

*Turner*, 2004 WL 1166587, at *13-14.  After jurors asked five additional questions regarding the consideration of prior inconsistent statements that are read into the record by an attorney as evidence, the judge sent the jurors to continue deliberating.  *Id.* at *15.

However, the prosecutor, Mr. Titus, agreed with the defense attorney that the jurors may have gleaned incorrect information:

> "I think, with all due respect, I think the Court misperceived the thrust of the jurors' questions." What they do not understand is that the evidence of a witness's prior statements came from the tape recording or the interviewer's testimony, but not from the prosecutor's reading of the interview.

> The court brought the jurors back in and explained: "As a result of a conference with the attorneys, ladies and gentlemen, I apparently-they feel that I didn't quite focus upon the real issue that you were having, and I'll attempt to clear that up at this time. Because what your question is that what Mr. Titus says is not evidence is correct.

> "Because what I apparently failed to emphasize with you is that the evidence is not what Mr. Titus says, answers or questions, it is in the actual evidence that comes before you by way of either the actual tape that's before you, not any kind of transcript that is read for purposes of helping you understand what's on that tape, but absolutely the tape itself and any statements made by any other witness from the stand that was given in that type-any officer or anyone else that was actually giving the evidence.

> "So it isn't the statements of Mr. Titus as such, it is only in the context of the statements that were properly admitted to you in that form.

> "So clearly, anything that Mr. Titus says in that way is not to be evidence, either the question or the answer, if they are just read to you in that form because that's not the evidence. The evidence is in the other form that comes before you.

> "I, again, see nodding assents. So I'm sorry for any problem in that everything that I said should be taken in that context. It is not Mr. Titus' statements, it is what comes in by virtue of the actual evidence that you received by way of those tapes and statements from officers from the stand. That's the real evidence."

*Id.* at *15-16.

The California Court of Appeal is the highest state court to address the merits of this claim in a reasoned decision. Therefore, this Court looks to the analysis of the Court of Appeal in evaluating Petitioner's claim. *LaJoie*, 217 F.3d at 669 n.7. The Court of Appeal considered and rejected this due process claim, finding that there was no reasonable likelihood that the jury was misled about the evidentiary value of the prosecutor's readings. *Turner*, 2004 WL 1166587, at *17. In the instant case, the court

noted that the trial court corrected any error by bringing the jurors back to provide a better answer to their questions. *Id*. at *16. The Court of Appeal also noted that even if the jury was confused about how to consider the prosecutor's reading of the transcript of interviews, the jury eventually heard the actual tape-recordings of the interviews as part of the evidence at trial. *Id*. at *17.

The instruction must be considered in the context of the instructions as a whole and the trial record to determine whether the instruction infected the entire trial and resulted in a conviction that violated due process. *See Estelle v. McGuire*, 502 U.S. at 72. Throughout the trial, the trial court regularly advised the jury that statements and questions made by the attorneys were not to be considered as evidence. *See, e.g.* RT 1085, 1122, 1351, 1383, 1388, 2157, 3304. There was a very short lapse of time between when the trial court made the challenged statements and when the court provided the appropriate clarification to the jurors. RT 3394-3401. Therefore, it is unlikely that the jury instruction and subsequent clarification infected the entire trial, such that the resulting conviction violated due process.

Regarding an ambiguous instruction, the court must determine whether there was a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution. *Estelle,* 502 U.S. at 72. The jurors in the instant case continued to ask questions until they walked away with a suitable answer. *See, e.g.* RT 3388-94. Moreover, once the trial court answered the jurors' questions accurately, the trial court stated that the jurors were nodding in assent and returned to deliberating. *Turner*, 2004 WL 1166587, at *16. Given the jurors' questions and reactions, there is not a reasonable likelihood that the jury applied the instruction in a manner that violated the Constitution.

The Supreme Court has held that even if an error in the application of the jury instruction is found, the court must also determine whether the error had substantial and injurious effect in determining the jury's verdict. *See Calderon v. Coleman*, 525 U.S. at

146.  The Court of Appeal noted that the prosecutor's questions that the jury may have taken into consideration were duplicative of the tape recordings entered into evidence containing the Delgado and Jordan interviews.  *Id*. at *17.  If admissible evidence says exactly that which the Prosecutor says during his questioning, any possible error in applying the jury instruction to the Prosecutor's questioning could not have had a substantial and injurious effect on the jury's verdict.

Petitioner is not entitled to federal habeas relief on his due process claim with regard to the trial court's instruction of the jury because the California Court of Appeal's rejection of the claim was neither contrary to, nor an unreasonable determination of, clearly established Supreme Court precedent.  *See* 28 U.S.C. § 2254(d).

### III.   Cumulative Error

Petitioner claims that the foregoing errors considered cumulatively warrant relief.  Petitioner is not entitled to federal habeas relief on this claims.

#### A.   Legal Standard

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution).  Where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation.  *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).

#### B.   Analysis

Because there are was no constitutional error found in the preceding claims,

23

there is nothing to accumulate in order to warrant relief.  Therefore, Petitioner's claim of cumulative error must be denied.

## **CONCLUSION**

After a careful review of the record and pertinent law, the petition for writ of habeas corpus is denied.  The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED:  July 10, 2008

_____
JEFFREY S. WHITE
United States District Judge

24

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

TURNER et al,

    Plaintiff,

 v.

RUNNELS et al,

    Defendant.

_____/

Case Number: CV05-04376 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on July 10, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Clayborn Sidner Turner T-03271
High Desert State Prison
P.O. Box 3030
Susanville, CA 96127-3030

Dated: July 10, 2008

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk